# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:18-cr-00342 |
| | ) | |
| SAMSON ORUSA | ) | |

## <u>MEMORANDUM OPINION</u>

Two years ago, on August 13, 2021, after an eight day trial, a jury found Samson Orusa guilty of (1) maintaining a drug-involved premises (Count One); (2) thirteen counts of unlawful distribution of a controlled substance (Counts Two to Four, Seven to Nine, Thirteen, Fifteen, Seventeen, Eighteen, and Twenty to Twenty-Two); (3) twelve counts of health care fraud (Counts Twenty-Four to Thirty-Six); and (4) nine counts of money laundering (Counts Thirty-Seven through Forty-Five). A little over a month later, on September 24, 2021, the jury returned special verdicts finding that certain bank accounts were the product of Defendant maintaining a drug-involved premises and unlawfully distributing controlled substances, and that some of those bank accounts and a Mercedes-Benz S550 were traceable to his money laundering scheme. Despite the number and gravity of the crimes for which he was convicted, Defendant has remained free pending sentencing.

A sentencing hearing was set for July 29, 2022. However, four days before that date, new counsel was granted permission to appear *pro hac vice*. That same day, July 25, 2022, counsel filed a Motion for New Trial (Doc. No. 290) based upon the Supreme Court's decision in <u>Ruan v. United States</u>, 142 S. Ct. 2370 (2022), which was decided on June 27, 2022. Defendant also filed a request for a continuance of the sentencing, but that request was held under advisement pending a status conference that was held at the time originally set for sentencing. (Doc. Nos. 291, 293).

Because Defendant's motion for a new trial was filed on the eve of sentencing and far outside the general deadline for such requests, extensive briefing and argument by the parties on the issue of excusable neglect followed. (Doc. Nos. 312, 327, 338, 345). This culminated in hearings on June 21, July 6, and July 28, 2023.

For the reasons stated below, the Court finds that counsel for Defendant intentionally engaged in gamesmanship in order to delay sentencing. Nevertheless, the Court will partially grant the Motion for New Trial because there was "<u>Ruan</u> error" in the instructions given to the jury on the unlawful distribution of controlled substances counts. Further, because those counts are inextricably intertwined with the maintaining a drug-involved premises count and the money laundering counts, a new trial will be granted on those as well. No new trial is warranted on the healthcare fraud counts, however, because they are self-contained and were not infected by any "<u>Ruan</u> error."

## I.

Rule 33 of the Federal Rules of Criminal Procedure governs motions for a new trial. The rule provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). It also provides that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." <u>Id.</u> (b)(2).

"However, Rule 33 must be read in conjunction with Federal Rule of Criminal Procedure 45, which provides that '[w]hen an act must or may be done within a specified period, the court . . . may extend the time . . . on a party's motion made . . . after the time expires if the party failed to act because of excusable neglect.' Fed.R.Crim.P. 45(b)." <u>United States v. Munoz</u>, 605 F.3d 359, 367 (6th Cir. 2010) (citing Advisory Comm. Notes to 2005 Amendments of Rule 33). In other words,

"even if the defendant moves for a new trial outside the fourteen days and without new evidence, the district court can grant the motion if it finds 'excusable neglect.'" United States v. Hall, 979 F.3d 1107, 1123 (6th Cir. 2020) .

"Excusable neglect" is an "elastic concept" and the determination of whether a party's neglect is excusable "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 392 (1993). Based upon the Supreme Court's decision in Pioneer, the Sixth Circuit has instructed a court to look to several factors in determining "excusable neglect":

> (1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith.

Hall, 979 F.3d at 1123 (quoting Munoz, 605 F.3d at 368). These factors "do not carry equal weight; the excuse given for the late filing must have the greatest import. While [the others] might have more relevance in a closer case, the reason-for-delay factor will always be critical to the inquiry." Munoz, 605 F.3d at 372-3 (quoting Lowry v. McDonnell Douglas Corp., 211 F.3d 457, 463 (8th Cir. 2000)).

## A.

The fourteen-day period under Rule 33 for filing a new trial motion serves the salutary purpose of retrying cases in a timely fashion. After all, memories tend to fade with time, and this can prejudice the Government when it primarily relies on witnesses to present its case. Moreover, "prompt filing of these motions allows for the presiding judge to rule on them while the evidence is still fresh in her [or his] mind." United States v. Elenniss, 729 F. App'x 422, 428 (6th Cir. 2018).

3

The Sixth Circuit recognized as much in Munoz, but also noted that "six months is not a sufficient period of time to create significant prejudice[.]" 605 F.3d at 371. Here, in contrast, the delay between the return of the verdict and the motion for a new trial was closer to a year, more precisely 11.5 months or 347 days. By any calculation, this delay was inordinate, at least in the abstract. It is even more so when one considers that, between the jury verdict and the Motion for a New Trial, the following occurred:

• September 24, 2021 – Forfeiture trial held, verdict returned, and probation directed to prepare a PSR

• January 25, 2022 – PSR disclosed to the parties

• February 14, 2022 – Government responds to PSR

• April 7, 2022 – Second draft of PSR provided to the parties

• April 15, 2022 – Third draft of PSR disclosed to parties

• April 19, 2022 – Government moves to set a sentencing hearing date

• May 16, 2022 – Status Conference held; court informed that Chicago attorney Beau Brindley may enter appearance; sentencing reset for June 29, 2022

• June 13, 2022 – Fourth revised draft of PSR disclosed and Defendant responds

• June 14, 2022 – Final PSR and Addendum disclosed to parties

• June 15, 2022 – Government and Defendant file their Position Statements regarding the final PSR

• June 20, 2022 – Defendant files Character/Witness List

• June 27, 2022 – Ruan opinion issued

• July 18, 2022 – Brindley moves for *pro hac vice* admission

• July 20, 2022 – Parties file their 3553(a) Sentencing Memoranda; Defendant files additional Good Character Letters

4

•July 25, 2022 – New trial motion filed

(Doc. Nos. 233, 258, 268, 269, 273, 274, 279, 280, 281, 284, 290, 298).  Also within this time period, Orusa hired Brindley in April or May of 2022, and provided him a "modest retainer to look into the case."  (Doc. No. 351, Brindley Aff. ¶ 1[1]).

Obviously, Defendant cannot be faulted for the bulk of this delay.  Ruan – which gave him a solid and definitive basis for moving for a new trial – was decided less than a month before he filed his motion for new trial.  This remains so, even though the possibility of Ruan changing the law was well-understood by the defense bar.  Indeed, it would have been impossible to make a Ruan argument before the case was actually decided.

In rejecting a similar argument after the Supreme Court in Skilling v. United States, 130 S. Ct. 2896 (2010) narrowed the reach of the term "honest services fraud" under 18 U.S.C. § 1346, one court observed:

> The United States counters that the defendants were aware that the case was pending before the Supreme Court and, therefore, they could have filed timely motions for acquittal or a new trial based on "the Skilling argument."  Without the benefit of the Supreme Court's opinion, however, any argument based on Skilling would have been purely speculative. The defendants had no way of knowing the outcome in advance.

United States v. Maricle, No. CRIM.A. 6: 09-16-S, 2010 WL 3927570, at *3 (E.D. Ky. Oct. 4, 2010) (citation to record omitted).  The failure to know Ruan's outcome, of course, did not preclude Defendant from moving for a stay in anticipation of Ruan, nor does it excuse counsel's machinations discussed below.

**B.**

In enacting statutes that recognize excusable neglect "Congress plainly contemplated that the

---

[1]  Brindley's affidavit is purportedly "Signed and Sworn" but contains no notary seal.

5

courts would be permitted, where appropriate, to accept late filings" based upon "intervening circumstances beyond the party's control." Pioneer, 507 U.S. at 388. A new rule of law, by definition, can be such a circumstance particularly where, as here, no final judgment has been entered, nor an appeal taken. See United States v. Nordlicht, No. 16-CR-00640 (BMC), 2023 WL 4490615, at *6 (E.D.N.Y. July 12, 2023); United States v. Chujoy, 207 F. Supp. 3d 660, 666 (W.D. Va. 2016); Maricle, 2010 WL 3927570, at *3 (E.D. Ky. Oct. 4, 2010), Indeed, "an intervening change in [the] law that could render a conviction unconstitutional [is] a textbook case of 'excusable neglect' justifying a failure to file [a new trial motion] earlier." United States v. Abu Khatallah, 316 F. Supp. 3d 207, 211 (D.D.C. 2018). Hence, it is hardly surprising that post-Ruan, defendants have sought and received new trials, even though their motions were not filed within the fourteen day window provided by Rule 33, United States v. Murphy, No. 520CR291LSCSGC1, 2023 WL 2090279, at *2 (N.D. Ala. Feb. 17, 2023), or had convictions vacated so that the trial court could consider claimed error in light of Ruan's new rule, United States v. Kabov, No. 19-50083, 2023 WL 4585957, at *6 (9th Cir. July 18, 2023). This begs the question: how long can a defendant wait to seek relief in the form of a request for a new trial? That depends.

After a new rule of law is announced, courts do not necessarily limit the time for filing a new trial motion to the fourteen days mandated by Rule 33. For example, when the Supreme Court held in Rehaif v. United States, 139 S. Ct. 2191 (2019) that the "knowingly" modifier under the felon in possession statute applied to both the possession and the status elements, some courts found excusable neglect where the motion for a new trial was filed a month and one-half after Rehaif was decided. See United States v. Robinson, No. 2:17-CR-20046, 2019 WL 7985173, at *5 (W.D. Tenn. Nov. 13, 2019) (finding excusable neglect where 47 days elapsed between time Rehaif was decided

6

and a new trial motion was filed); United States v. Sepulveda, 420 F. Supp. 3d 153, 168 (S.D.N.Y. 2019) (45 day delay); United States v. Gear, No. CR 17-000742 SOM, 2019 WL 4396139, at *4 (D. Haw. Sept. 13, 2019) (stating that 47-day delay "could conceivably constitute excusable neglect").

**C.**

Because Defendant filed his motion only 28 days after Ruan was decided, he argues that excusable neglect has been shown. He insists the motion was filed as soon as possible considering that Ruan was issued two days after Brindley went on a family vacation to the Bahamas from which he did not return until July 5, 2022. Moreover, two days after his return, Brindley began a first degree murder trial in Chicago that he prepared for while in the Bahamas. Brindley maintains he could not have filed the motion any sooner, even with the help of associates at his firm who were toiling away on Ruan cases.[2] (Brindley Aff. ¶¶ 3, 5, 6).

In Munoz, the Sixth Circuit stated that "a district judge is in the best position to know how long a diligent successor counsel would require to research and prepare a new-trial motion under the circumstances presented by any given case." 605 F.3d at 372. This Court finds that the motion for a new trial could have and should have been filed sooner, and that neither Defendant's position nor Brindley are credible.

For one, Brindley is a self-professed expert on all things Ruan/Kahn.[3] Not only did he argue

_____

[2] The brief that was eventually filed is 19-pages long, the vast majority of which is devoted to discussing Section 841, its history, and different circuit's treatment of the knowledge requirement under that statute. Only 5 pages address Defendant's case specifically, of which one entire page is verbatim copy of this Court's good faith instruction. This led the Government to "wonder[] if most of the motion had not already been written in the leadup to the Ruan litigation." (Doc. No, 312 at 8). So does the Court. The Court also questions the assertion in Defendant's reply brief that "the detail of the brief illustrates that it is not something that could be researched and prepared within the span of a week or two." (Doc. No. 294 at 4).

[3] Kahn v. United States was consolidated for decision with Ruan.

Kahn before the Supreme Court, he has made it clear to this Court on numerous occasions that he represents numerous clients around the country pursuing Ruan claims. With his background and expertise, it should have been abundantly clear to Brindley that Ruan was potentially a game-changer with respect Orusa. Because of all that had transpired between the time his client was convicted and Ruan was decided, one would have expected Brindley to hew closely to the 14-day period set out in Rule 33 rather than take the chance that delay beyond that point would ultimately be found to be excusable. He chose not to do so at his client's peril.

Worse yet, Brindley attempted to make his executive assistant a scapegoat by claiming she sent his *pro hac vice* paperwork to the wrong courthouse and then neglected to check on the status of his application for two weeks. (Id. ¶ 3). This resulted in two more applications having to be mailed (the first of those also sent to the wrong courthouse) and ensuing "administrative delay" until his *pro hac vice* was granted on June 25, 2022. (Doc. No. 289). Under this version of events, he simply could not have presented the new trial motion sooner – it was filed the very day his application was finally approved.

Even if all of that is true, which the Court is disinclined to believe given Brindley's utter lack of credibility,[4] it matters not a bit. According to the Clerk of this Court, who testified at the

---

[4] Brindley testified at length at the evidentiary hearing on July 6, 2023, during which time the Court had the ability to gauge the factors that go into making credibility determinations, including his mannerisms on the stand, his interests in the outcome of the proceedings, his bias, and the overall reasonableness of his testimony in light of all the evidence before the Court. Suffice it to say that Brindley failed on every measure. Indeed, Brindley's goal seemed to be to testify in such a way that everything fit his narrative regardless of whether it even made sense. He even had justifications and rationales (sufficient at least in his mind) that explained why Judge Easterbrook of the Seventh Circuit was wrong in issuing a "public rebuke" and sanctioning him $2,000 for falsely representing that an appellate record was complete, United States v. Johnson, 745 F.3d 227, 231 (7th Cir. 2014), and why Judge Michael P. McCuskey's acted "illegally" in finding him in contempt and remanding him into custody, United States v. Britton, 731 F.3d 745 (7th Cir. 2013).

evidentiary hearing on July 6, 2023, Brindley had CM/ECF filing privileges in this Court as of June 2, 2022. This is because he already was counsel of record in <u>United States v. Marks</u>, 2:19-cr-00003 (M.D. Tenn. 2019), another unlawful distribution of opioids case against healthcare professionals that was pending in this district. In other words, even before <u>Ruan</u> was decided, Brindley could have filed motions in this case.

Furthermore, none of the foregoing explains why local counsel, Peter Strianse, the one who actually tried the case, could not have filed a more timely new trial motion, or at least a motion to stay sentencing. Here, things get even more interesting and further draw Brindley's credibility into question.

Brindley emailed Strianse a draft Motion to Stay on May 12, 2022. In the cover email, Brindley wrote:

> Peter,
>
> Dr. Orusa has already reviewed it. I am attaching it below. It can be filed immediately. <u>In terms of pro hac vice, I just have to submit the application, which is simple. I was waiting as I thought that process **might help with this delay**</u>. So, we could do it one of two ways. You could add your signature and e-file it now. You could then advise [the] Court it has been prepared with newly engage *pro hac vice* counsel who is submitting [an] application for admission immediately. And that you would like to set a date for the motion to be heard with *pro hac vice* counsel.
>
> Or you could advise new counsel is engaged. *Pro hac* application is coming in imminently. A motion to stay has been prepared and will be filed as soon as that application is approved. Which do you think will work better with the judge?
>
> Motion is attached.
>
> BB

(Doc. No. 351-1) (emphasis added). Strianse, who had yet to meet Brindley, was understandably reluctant to file the motion. He did however, mention to the Court during a telephone status

9

conference that same afternoon that he had received a draft motion to stay. For reasons that are still not entirely clear to the Court, the Motion to Stay was never filed.[5] This failure adversely affected the use of judicial resources that are limited even in the best of circumstances.

As already noted, sentencing was set for July 28, 2022. An entire day was reserved for the hearing because Orusa indicated that he intended to call 8 character witnesses. (Doc. No. 277). The parties duly filed their Objections to the PSR on July 15, 2022 (Doc. Nos. 276, 277) and their Sentencing Memoranda relating to the 18 U.S.C. § 3553(a) factors on July 20, 2022 (Doc. No. 280, 284). Orusa also filed 59-pages of character letters and documents relating to the honors he had received and the mission trips he had been on. (Doc. No. 281). Although Ruan had been decided by the time of these filings and it was discussed briefly in Defendant's Sentencing Memorandum (Doc. No. 284 at 3, 4), he chose not to move for a new trial at that time, and the motion to stay was not mentioned again, leading the Court to believe both were abandoned. Never did it occur to the Court that the timing of Brindley's *pro hac vice* application was part of a delay tactic.

With just three days remaining before sentencing, Orusa filed his Motion for a New Trial, along with a Motion to Continue. (Doc. No. 291). By then, of course, the Court was heavily into preparing for sentencing, a task it does not undertake lightly:

---

[5] The Government correctly observes:

[G]iven the speculation in the legal community around Ruan, and co-counsel Brindley's personal involvement in the case, defense counsel might have filed a simple, prospective, placeholder-to-be-held-in-abeyance motion for new trial if not within 14 days of a verdict, then on November 5, 2021, when the Supreme Court agreed to hear Ruan, or on March 1, 2022 the date of the oral argument in Ruan, or in mid-May alerted the Court as to co-counsel Brindley's intention to appear and file a motion to stay sentencing. So too, Defendant might have filed on June 27, 2022, a simple, placeholder motion for new trial based upon the Ruan decision, reserving the right to fully brief the issue thereafter.

(Doc. No. 312 at 9).

> The Court takes its sentencing responsibility seriously, and spends countless hours preparing for each sentencing hearing[.]  This is because there is nothing simple or easy about sentencing another human being. Until you have done it, you have no appreciation of the gravity of the responsibility.

United States v. Burks, 408 F. Supp. 3d 908, 911 (M.D. Tenn. 2019).  Had the Court known that a Motion for New Trial was about to be filed, that preparation may not have been for naught.

Defendant attempts to bolster his excusable neglect argument by relying on both Hall and Munoz.  He notes that, in Hall, the Sixth Circuit found "the impact on judicial proceedings was minimal" even though, much like here, defendant "was only a week away from sentencing when her newest counsel filed the Rule 33 motion, the district court had not yet sentenced Hall, and no appeal had occurred."  979 F.3d at 1126.  And, in Munoz, the delay was much longer – five weeks.  However, Pioneer teaches that whether a party's neglect may be excused is an equitable decision turning on "all relevant circumstances surrounding the party's omission," 507 U.S. at 395, and in this regard Defendants reliance on both cases is entirely misplaced.

In Hall, the Sixth Circuit affirmed the district court's finding of no excusable neglect because, among other things, "new counsel filed a motion related to sentencing . . . before the Rule 33 motion suggesting to the district court that everyone was proceeding along toward sentencing."  979 F.3d at 1124.  That is exactly what happened here.

In Munoz, on the other hand, excusable neglect was found, even though the delay was five weeks and the Sixth Circuit had "certainly found delays of this magnitude inexcusable in the past."  Munoz, 605 F.3d at 372 (quoting United States v. Nafzider, 467 F.3d 515, 523 (6th Cir. 2006) (finding 37-day delay no excusable neglect under circumstances).  However, "only five days after the defendant's new counsel entered the scene [in Munoz], she informed the district court that she

planned to file a motion for a new trial under Rule 33." Hall, 979 F.3d at 1123. Here, of course, new counsel filed the motion for a new trial upon the heels of his appearance but, by then, he had been retained for at least two months and he admittedly was trying to "help th[e] delay." Moreover, a primary factor in Munoz's delay consideration was defendant's claim that trial counsel had been ineffective, something that is not alleged here.

**D.**

Although neither Munoz nor Hall helps Defendant on the issue of excusable neglect, Munoz does help on another front. The Sixth Circuit in Munoz found it "significant that Pioneer was a bankruptcy case [and that] Pioneer's 'your lawyer, your fault' principle should be applied less stringently in the criminal context, where 'our legal traditions reflect a certain solicitude for [a defendant's] rights, to which the important public interests in judicial efficiency and finality must occasionally be accommodated.'" 605 F.3d at 369 (quoting Stutson v. United States, 516 U.S. 193, 196 (1996)). The Munoz court also relied on the Eleventh Circuit's observation that "under fundamental tenets of agency law, a principal is not charged with an agent's actions or knowledge when the agent is acting adversely to the principal's interests" and that "in some circumstances [attorney] malfeasance may be far enough outside the range of behavior that reasonably could be expected by a client" that it would be inappropriate to impute the "attorney misconduct to [the] client." Id. (quoting Downs v. McNeil, 520 F.3d 1311, 1319-21 (11th Cir. 2008)); see also, Elenniss, 729 F. App'x at 425 (citation omitted) (following Munoz and stating that "your lawyer, your fault" is applied less stringently in criminal cases). Allowing some leeway in the criminal context is in keeping with Pioneer's observation that the excusable neglect "determination is at bottom an equitable one," Pioneer, 507 U.S. at 395, and Justice Frankfurter's recognition that "[e]quity eschews

12

mechanical rules; it depends on flexibility," Holmberg v. Armbrecht, 327 U.S. 392, 396 (1946).

It would be one thing if Brindley's actions were due to mere negligence. They were not. His failure to move more promptly for a new trial or to stay was an intentional and calculated decision meant to insure that sentencing would not go forward as planned. Without question, Defendant was a beneficiary of Brindley's delay tactics because he remains free when he otherwise would have been taken into custody. The Court cannot say, however, that Defendant was a fully-informed participant or that he knew what Brindley was doing skirted the bounds of professionalism, candor, and good faith. For this reason, and also because Ruan wrought a sea-change in the law that could affect the majority of counts against Defendant, the Court turns to the merits.

## II.

Counts Two through Twenty-Three of the Indictment charged Defendant, a physician, with violation 21 U.S.C. § 841(a)(1), which makes it unlawful, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." After setting forth the relevant language from the statute, the Court began by instructing the jury:

> The defendant was a physician. Under the law, physicians are permitted to write prescriptions and to have drugs dispensed as ordered. Thus, for you to find defendant guilty, the evidence must prove that defendant did so without legitimate medical purpose in the usual course of professional medical practice or beyond the bounds of professional medical practice.

(Doc. No. 208 at 31). The instructions then set forth the particulars of each count (*i.e.* the patient, the prescription date, the controlled substance prescribed, and the prescription number), after which the jury was instructed:

Counts Two through Twenty-Three of the indictment charge the defendant with the

13

crime of knowingly or intentionally distributing a controlled substance not for legitimate purpose in the usual course of professional medical practice or beyond the bounds of professional medical practice. For you to find the defendant, a licensed physician, guilty of this crime, you must find that the government has proved each and every one of the following elements beyond a reasonable doubt:

> (A) The defendant knowingly and intentionally distributed a controlled substance.
>
> (B) The defendant knew that the substances distributed were controlled substances under the law.
>
> (C) That the defendant prescribed the drug without a legitimate medical purpose in the usual course of professional medical practice or were beyond the bounds of professional medical practice.

(Id. at 34). The instructions then defined the terms: (1) "controlled substance"; (2) "distribute"; (3) "practitioner"; (4) "prescription"; and (5) "to distribute." (Id. at 35-37).

The instructions given to the jury were in keeping with controlling Sixth Circuit authority. In particular, in United States v. Godofsky, 943 F.3d 1011, 1026-27 (6th Cir. 2019), the court held that the subjective good faith of a physician-defendant was irrelevant to the "except as authorized" clause of Section 841(a). Godofsky's holding, however, was eviscerated by the decision in Ruan.

The question before the Supreme Court in Ruan was whether it was "sufficient for the Government to prove that a prescription was in fact not authorized," or whether the Government was also required to "prove that the doctor knew or intended that the prescription was unauthorized." 142 S.Ct. at 2376. In no uncertain terms, the Court held:

> § 841's "knowingly or intentionally" *mens rea* applies to the "except as authorized" clause. This means that once a defendant meets the burden of producing evidence that his or her conduct was "authorized," the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner.

142 S. Ct. at 2376. This meant that the prosecution had to prove that the physician-defendant not

14

only objectively but also subjectively knew that he or she was prescribing a controlled substance with no legitimate medical purpose.

## A.

The instructions given to the jury in this case do not comport with Ruan, a point the Government begrudgingly concedes. (Doc. No. 312 at 11). Nevertheless, the Government submits that "the instructions that the Court gave were sufficiently similar in substance to the instructions required by Ruan that any instructional error was harmless" because the jury was also instructed on Defendant's theory of the case which was that "he acted in good faith." (Id.)

On the question of good faith, the jury was instructed in part:

> To satisfy the third element of Counts Two through Twenty-Three, the United States must prove beyond a reasonable doubt that the defendant distributed the specified controlled substance other than for legitimate medical purposes in the usual course of professional medical practice, or beyond the bounds of professional medical practice. To determine whether defendant acted lawfully or unlawfully you must consider the question of good faith.

> Good faith means an honest exercise of professional judgment, including even flawed attempts to comply with professional medical practices or even mistaken beliefs that the prescriptions were for legitimate medical purposes, as to a patient's medical needs. In making a medical judgment concerning the right treatment for an individual patient, licensed medical professionals have discretion to choose among a wide range of options.

> However, a licensed medical professional's own treatment methods do not themselves establish what constitutes professional medical practice. In determining whether the defendant's conduct was within the bounds of professional medical practice, you should, subject to the instructions I give you concerning the credibility of experts and other witnesses, consider the testimony you have heard about what constitutes well-accepted medical practice. You should consider the defendant's actions as a whole, the circumstances surrounding them, and the extent and severity of any violations of professional norms you find the defendant may have committed.

> The Defendant does not have to prove to you that he acted in good faith; rather, the burden of proof is on the government to prove to you, beyond a reasonable doubt,

15

that the Defendant acted without a legitimate medical purpose outside the course of usual professional practice.

A licensed medical professional's conduct may constitute a violation of applicable professional regulations or guidance as well as applicable criminal statutes. However, a violation of a professional regulation or guidance does not in and of itself establish a violation of the criminal law. As I just explained, in determining whether or not the defendant is guilty of the crimes with which he is charged, you should consider the totality of his actions and the circumstances surrounding them, and the extent and severity of any violations of professional norms that you may find the defendant may have committed.

(Doc. No. 208 at 39-41).

The Government argues, however, that ths good faith instructions coupled with the Court's rejection of the its proposed deliberate indifference instruction "built in an unduly defense-friendly escape hatch that might have resulted in an acquittal or a hung jury. That is, Defendant might have nonetheless escaped conviction if the jury determined that he subjectively believed that his idiosyncratic pain-management methodology fell outside the accepted bounds of professional practice, but also determined that Defendant had engaged in "an honest exercise of professional judgment . . . as to a patient's medical needs." (Doc. No. 312 at 12).

In <u>Ruan</u>, "the Supreme Court gave limited counsel . . . regarding good faith instructions, stating only that '§ 841, like many criminal statutes, uses the familiar mens rea words 'knowingly or intentionally.' It nowhere uses words such as 'good faith,' 'objectively,' 'reasonable,' or 'honest effort.'" <u>United States v. Anderson</u>, 67 F.4th 755, 765 (6th Cir. 2023) (quoting <u>Ruan</u>, 142 S. Ct. at 2381). However, on remand from the Supreme Court, both the Eleventh Circuit in <u>United States v. Ruan</u> ("<u>Ruan II</u>"), 56 F.4th 1291 (11th Cir. 2023), and the Eighth Circuit in <u>United States v. Kahn</u> "<u>Khan II</u>"), 58 F.4th 1308 (10th Cir. 2023) discussed such an instruction in light of the Supreme Court's holding.

In Ruan II, the jury was given the following good faith instruction:

A controlled substance is prescribed by a physician in the usual course of a professional practice and, therefore, lawfully, if the substance is prescribed by him in good faith as part of his medical treatment of a patient in accordance with the standard of medical practice generally recognized and accepted in the United States.

56 F.4th at 1297. The Eleventh Circuit found this instruction insufficient for three reasons. First, "the passing reference to 'good faith'" was "inadequate" and "[w]ithout further qualification . . . . encompasse[d] both subjective and objective good faith." Id. "Second, even viewing this phrase in the context of the 'entire charge,' the remaining jury instructions did not help convey that a subjective analysis was required for the 'except as authorized' exception." Id. "Third, and finally, the summary of the charge also did not help to convey the required mens rea." Id. Ultimately, the Eleventh Circuit held that the instruction did not correct the Ruan error and that the error was not harmless beyond a reasonable doubt.

In Khan II, the good faith instruction was more detailed. It provided:

The good faith of Defendant Shakeel A. Kahn is a complete defense to the charges in Count One (conspiracy to commit a federal drug crime) as well as the charges in Counts Four, Six, Seven, Eleven, Fourteen, Sixteen, Nineteen, and Twenty (knowingly and unlawfully dispensing and/or distributing Oxycodone outside the usual course of professional practice and without a legitimate medical purpose), because good faith on the part of Defendant Shakeel Kahn would be inconsistent with knowingly and intentionally distributing and/or dispensing controlled substances outside the usual course of professional practice and without a legitimate medical purpose, which is an essential part of the charges. "Good faith" connotes an attempt to act in accordance with what a reasonable physician should believe to be proper medical practice. . . . The good faith defense requires the jury to determine whether Defendant Shakeel Kahn acted in an honest effort to prescribe for patients' medical conditions in accordance with generally recognized and accepted standards of practice.

Kahn, 58 F.4th at 1313. Even so, the Eighth Circuit found the instruction insufficient post-Ruan

17

because "[t]he good faith exception's reliance on terms like 'reasonable physician' and 'should believe' impose an objective standard and are exactly the type of language that the Supreme Court stated is impermissible." Id. at 1317. Moreover,"the jury was repeatedly instructed that it could convict Dr. Kahn if it concluded that he acted outside the usual course of professional medical practice or without a legitimate medical purpose." Id. at 1315. Like the Eleventh Circuit, the Eighth Circuit found that the Ruan error was not harmless beyond a reasonable doubt.

For its part, the Sixth Circuit has not directly addressed whether a "good faith" instruction standing alone is sufficient to ameliorate Ruan error. For example, in Anderson, the Sixth Circuit was presented with the question of whether the trial court erred in *failing* to give a good faith instruction requested by a physician-defendant, and found that it did not. Noting that the decision in Ruan II "implies that a properly qualified subjective good faith instruction performs the same function as the 'knowledge or intent' requirement identified by the Supreme Court," the proposed good faith instruction tendered to the district court "did not contain any 'further qualification' that made clear Anderson's subjective good faith was the relevant inquiry." Anderson, 67 F.4th at 765. Nevertheless, Anderson's conviction for unlawfully distributing controlled substances was affirmed because other instructions "given to the jury specifically cover[ed] the holding of Ruan, by referring continuously to 'knowledge of the defendant,' his 'deliberate ignorance,' and if he 'knew' that the prescriptions were dispensed illegally." Id. This included a deliberate indifference instruction that read:

> Although knowledge of the defendant cannot be established merely by demonstrating he was careless, knowledge may be inferred if the defendant deliberately blinded himself to the existence of a fact. No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that the controlled substance was distributed or dispensed

without a legitimate medical purpose in the usual course of professional practice, then you may find that the defendant knew this was the case.

Id. It also included an instruction that read:

But you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that the controlled substances were distributed or dispensed other than for a legitimate medical purpose while acting in the usual course of professional practice, and that the defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part are not the same as knowledge and are not enough to find him guilty on this count.

Id. Relying substantially on Anderson, the Sixth Circuit reached the same conclusion on plain error review. United States v. Sakkal, No. 20-3880, 2023 WL 3736778, at *5 (6th Cir. May 31, 2023).

Here, the good faith instruction given to the jury was far more robust than in Ruan II and paralleled that requested in Anderson. Unlike in Anderson, however, no deliberate indifference charge was given, nor was the requisite *mens rea* described as being more than carelessness or negligence. Instead the jury was instructed about knowledge with respect to the first two elements (he distributed a controlled substance and knew it was such), but not that he subjectively knew the drugs he prescribed were without a legitimate medical purpose or were beyond the bounds of professional medical practice as required by Ruan.

Moreover, and as in Kahn II, the jury was repeatedly instructed that defendant could be convicted if it concluded that he acted outside the usual course of professional medical practice, without any link to his subjective intent. Even in the good faith instruction, the jury was charged that "the United States must prove beyond a reasonable doubt that the defendant distributed the specified controlled substance other than for legitimate medical purposes in the usual course of professional medical practice, or beyond the bounds of professional medical practice," (Doc. No. 208 at 39), without reference to subjective knowledge and intent. Accordingly there was Ruan error that was

19

not cured by the instructions that were given to the jury.

**B.**

The conclusion that the jury was not properly instruction does not mean that a new trial is automatic. "The error at issue here – a jury instruction that omits an element of the offense" is subject to harmless error review. Neder v. United States, 527 U.S. 1, 8, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999).

To be sure, the evidence was more than sufficient to convince the jury that Defendant was running what can only be characterized as a "pill mill." This included, but was not limited to, evidence that: patients would arrive and the parking lot would be overflowing long before the clinic opened; patients would exchange urine samples and drugs in the parking lot; the waiting area was always overcrowded with standing room only; Defendant repeatedly arrived hours after the clinic opened; patients traveled from out-of-state to the clinic; patients overdosed in the waiting room on more than one occasion; "medical examination" almost always lasted just a few minutes; prescriptions were passed out during what looked like a "cattle call" at the end of the day; pharmacies refused to honor prescriptions written by defendant; defendant ignored patient's repeated drug screen failures and accepted patients who had been discharged from other pain clinics for similar conduct; defendant ignored employee's concerns for patient safety and warnings from insurance companies that he was in the top 1% of opioid prescribers in the state of Tennessee; Defendant sometimes submitted billing for more hours than in a day; and Defendant occasionally prescribed controlled substances to more than 150 patients in a day.

It is true, as the Government observes, that "[t]he Supreme Court advised in Ruan, '[t]he Government . . . can prove knowledge of a lack of authorization through circumstantial evidence,"

20

and that "the scope of a doctor's prescribing authority" remains tethered to "objective criteria such as 'legitimate medical purpose' and 'usual course' of 'professional practice.'" (Doc. No. 312 at 14 (quoting Ruan 142 S. Ct at 2382). The Government also cogently argues that "[t]he evidence at trial belied Defendant's theory that he was acting in good faith." (Id.). Indeed, the Court could even go one step further and say that the evidence at trial as to the lack of good faith was overwhelming.

The problem is, however, with the way the Indictment was drafted. Each Section 841 count is linked to a specific patient, i.e., on a specific day a specific prescription was given to a specific patient. Overwhelming as the evidence might have been regarding Defendant's overall practices, the Court simply cannot say that a properly instructed jury would have found him guilty beyond a reasonable doubt of unlawfully prescribing oxycodone to "B.S." on April 12, 2017 (Count Two); to unlawfully prescribing the same drug to "M.S." on April 10, 2018 (Count Eight); to "D.B." on August 20, 2018 (Count Thirteen); and to "W.A." on September 5, 2018 (Count Twenty-Three), etc. As the Eleventh Circuit observed after remand in Ruan:

> The jury could have weighed all of this evidence and concluded that [Defendant] subjectively believed [his] conduct was in accord with the appropriate standard of care. But under the erroneous instruction that was given, the jury could convict the defendant[] if they found that a reasonable doctor would not have believed the conduct was in accord with the appropriate standard. In other words, a properly instructed jury may not have convicted the defendant[] had it known that [his] subjective beliefs that [he] w[as] acting properly was a defense to these charges.

Ruan II, 56 F.4th at 1298. Nothing but conjecture supports the conclusion that a properly instructed jury would have returned the same verdicts of guilt. Accordingly, a new trial is warranted on the Section 841 drug counts for which Defendant was convicted.[6]

_____

[6] Obviously, a new trial can only be granted "on the counts on which the jury found Defendant guilty, as Double Jeopardy bars retrial on the acquitted counts." United States v. Flynn, No. 2:19-CR-208, 2023 WL 2552741, at *13 (S.D. Ohio Mar. 17, 2023); see, Benton v. Maryland, 395 U.S. 784, 796 (1969)

**C.**

The conclusion that a new trial must be held on the Section 841 counts means that a new trial must also be held on the count of maintaining a drug premises (Count One) and the money laundering counts (Counts Thirty-Seven through Forty-Four). This is because Count One of the Indictment links maintaining a drug premises to the unlawful distribution of drugs and healthcare fraud. Similarly, the money laundering counts allege that financial transactions "involved the proceeds of a specified unlawful activity, namely, maintaining a drug-involved premises, in violation of Title 21, United States Code, Section 856; unlawful distribution of a controlled substance prescribed outside the bounds of professional medical practice, in violation of Title 21, United States Code, Section 841; and health care fraud, in violation of Title 18, United States Code, Section 1347[.]" (Doc. No. 3, Indictment at 14-15).

A new trial will not be granted on the healthcare fraud counts, however, for four reasons. First, the healthcare fraud is not linked to illegal drug trafficking. Instead, it is alleged that Defendant upcoded visits to CPT 99214 and 99215, meaning that he spent twenty-five minutes, or forty minutes, respectively, with the patient. The jury had more than enough evidence from which it could conclude that Defendant never spent that amount of time with any patient. Second, Defendant never mentioned the healthcare fraud counts in his motion for a new trial and only referenced them in his reply. See Sanborn v. Parker, 629 F.3d 554, 579 (6th Cir. 2010) (arguments raised for the first time in a reply brief are waived); Am. Trim, L.L.C. v. Oracle Corp., 383 F.3d 462, 477 (6th Cir. 2004) (same). Third, when Defendant finally raised the issue of the continued viability of his healthcare fraud conviction post-Ruan, he did so only in a perfunctory manner. See United

_____

(holding that the Double Jeopardy Clause barred retrial on acquitted count).

States v. Brown, 819 F.3d 800, 829 (6th Cir. 2016) ("[I]ssues ... unaccompanied by some effort at developed argumentation ... are deemed waived[.]") (internal quotation marks omitted)).  Fourth, Defendant's argument that "[t]here is no way the jury could have divorced its consideration of his mindset on the unlawful prescription charges from his mindset regarding billing practices" neglects to consider that the jury was properly instructed on the healthcare fraud counts and instructed that each count is to be considered separately.  See United States v. Harvey, 653 F.3d 388, 396 (6th Cir. 2011) ("Jurors are presumed to follow instructions."); United States v. Neuhausser, 241 F.3d 460, 469 (6th Cir. 2001).

Finally, because Defendant has never sought a new trial on his forfeiture verdict, let alone briefed the issue, no new trial will be granted on the forfeiture counts.

## III.

For the foregoing reasons, Defendant's Motion for a New Trial will be granted in part and denied in part.  The Motion will be granted with respect to his convictions for (1) maintaining a drug-involved premises (Count One); unlawfully distributing controlled substances (Counts Two, Three, Four, Seven, Eight, Nine, Thirteen, Fifteen, Seventeen, Eighteen Twenty, Twenty-One, Twenty-Two); and money laundering (Counts Thirty-Seven through Forty-Four).  In all other respects, the Motion will be denied.

An appropriate Order will enter.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

23